UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 19-cr-244 (NEB/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S TRIAL BRIEF** |
| v. | ) | |
| | ) | |
| TRAVIS KYLE MAYER, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Alexander D. Chiquoine and David P. Steinkamp, Assistant United States Attorneys, submits the this trial brief in the above captioned matter.

I.    OFFENSE CONDUCT AND CHARGE

In July of 2019, the defendant, Travis Kyle Mayer ("Mr. Mayer"), was an inmate awaiting trial on federal child exploitation charges (19-cr-96 (WMW/HB)) in the Sherburne County Jail (the "Jail"). He was angry, or as he put it, "in a mood." He did not like being locked up and was convinced the Jail was "fuckin' with" his mail in that it was being delayed.[1] Mr. Mayer knew exactly what he wanted to do in retaliation—hurl his feces and/or urine on the guards.

---

[1] Jail staff and federal agents were in fact monitoring Mr. Mayer's non-privileged mail because he previously sent a harassing and threatening letter to a witness. (*See* Dkt. 37 at 1–5; Dkt. 39 at 2–5; Dkt. 40). This surveillance of Mr. Mayer's mail was entirely constitutional and permissible, a fact already decided after extensive litigation, and which should not be re-litigated before the jury. (*See* Dkt. 39, 40).

By July of 2019, Mr. Mayer was practiced in acting out in correctional institutions. From approximately September of 2018 to April of 2019 (when he was arrested on federal charges and transferred to Sherburne) he was housed in the Freeborn County Jail on state charges. During his incarceration at Freeborn, Mr. Mayer got mad and acted out by tampering with the fire suppression system, damaging property (primarily by smearing his feces around his cell and using his clothing to clog the toilet and flood his cell), and threatening staff. He went so far as to throw urine on a guard. For this, Mr. Mayer was charged with fourth degree assault and tried in Freeborn County. However, remarkably, Mr. Mayer was acquitted in May of 2019.

Despite this acquittal, in his letters and jail calls from the Sherburne County Jail, Mr. Mayer made clear that he was in fact guilty of the Freeborn assault and elated by his acquittal. For instance, in call to his brother on July 7, 2019, Mr. Mayer proudly announced that he was "guilty as fuck" of the Freeborn assault, but was acquitted nonetheless. On that same call, Mr. Mayer announced his new plan to "get even" with the Sherburne County Jail:

> But I figure, you know, like I told 'em, I said, "Listen, you guys are gonna make me get fuckin', you guys are gonna have a shitty day, you guys are gonna be pissed off and pissed on, and I'm gonna walk on the charges." And guess what? I told 'em that last time and what happened? I walked on it.

In numerous letters and calls, Mr. Mayer graphically laid out his anger with the Jail and how he intended to assault staff by throwing feces and/or urine on them, or far worse. For instance, in a call on July 10, 2019, Mr. Mayer announced:

The whole point is, if they fuck with me, I gotta ride out. [*stammering*] You know me, I'll get butt naked again, I'll rub shit on myself and make 'em come in my cell. I don't give a fuck. I'll throw shit on 'em. I'll punch 'em. I'll stab 'em, I don't give a shit, you know me.

In a call with his mother (Cindy) on July 17, 2019, Mr. Mayer carefully explained his plan for escalating "retaliation" against the Jail:

Travis:       No, but, ummm, but yeah, irregardless [sic], what I'm sayin' is, uhhh. So, uh, first time, it'll probably be piss or a punch to one of the COs, I'll punch 'em or fuckin' throw piss on 'em, or shit. Or maybe I'll jack off in a cup and throw cum on them.

Cindy:        Ewww, Travis!

Travis:       And then, and then the next time, and then the next time, it's gonna be fuckin', it's gonna be a fuckin' pencil in their … Ya know, I'll stab one of them.

Cindy:        Travis.

Travis:       It'll escalate each time. And I give them warnings. And I promise you, I don't care who's listening to this phone call on the other end, I will walk on the charges, like I did last time. I told ya that, didn't I?

Cindy:        Not if you stab one of them, Travis.

Travis:       Listen, trust me, I know what I'm doing. I told before I was gonna walk on it, didn't I?

Cindy:        Yeah, but you're not gonna walk out this time if you actually harm 'em, Travis. That's a weapon.

Travis:       We'll see.

In a letter to his mother just a few days later, Mr. Mayer was more succinct in describing his intentions:

> *to long to get to me to begin with. And I'm about to catch a felony and hurt someone here, I did it at Freeborn County Jail, and I walked free on the charge, I'll do it again here. I know the*

Still angry, but emboldened from his recent acquittal, Mr. Mayer decided to heed his mother's warning about not using a weapon and settled on a plan to recreate his "success" in Freeborn—if the Jail did not meet his demands, he would throw urine or feces on the guards.

Mr. Mayer did not care who knew his plan.  On July 20, 2019, he wrote a grievance to Jail administration about his mail and phone calls.  In it, Mr. Mayer made a number of threats:

> **Complaint (denuncia):** Do Not pull no "It's not US" bullshit, I'm the wrong motherfucker. this again management don't mean shit to me, so don't make no threats towards me about it. Jail Administrator Brian Frank has refused to answer/respond/and deal with my issues. I wrote 4 kites to him about my mail and why it is delayed - taking 6-9 days to get to me. 2 of the kites were informal grievances, and the first kite was over a month ago. What is my mail status? Am I on "Mail Watch"? Who authorized this "Mail Watch"? I and/or my lawyer legally have to be notified, so why have we not been so? I demand to speak to someone about this, I will advise/warn you, do not fuck with my mail, this is my last warning, I promise this is no threat.
>
> No more fucking games, I've said this and I mean it. So get both these issues fixed and soon. I want a copy of this back, ~~understand~~ **For Office Use Only** and your response.

On July 25, 2019, Mr. Mayer told a guard that he would throw urine and/or feces on Jail staff if his demands, especially regarding his mail, were not met.  The guard documented and reported this threat.  Based on this threat, and Mr. Mayer's increasingly hostile interactions with staff, the Jail decided to move him to a cell in a more restrictive unit.

4

On July 26, 2020, Jail staff prepared to move Mr. Mayer to his new cell. They told Mr. Mayer that he was being moved and ordered him to place his hands through a slot in the cell door so he could be handcuffed. Mr. Mayer was enraged and refused, instead demanding to know why he was being moved. Sensing trouble, Jail staff decided to videotape their efforts to extract Mr. Mayer from his cell.

As Jail staff prepared to take more assertive action to force Mr. Mayer to comply with their commands (e.g., shutting off the water to his cell, removing other inmates from the unit in case they needed to use a chemical irritant, etc.), one officer filmed him through his cell window. Mr. Mayer pumped the officer for information, particularly whether he was going on "lock down" or "disciplinary status." When the officer said that he was, Mr. Mayer announced, "No, no, no. Now, now, now I'm on bullshit. Alright, I see how it is. Now I'm going on bullshit."

Mr. Mayer began to use toothpaste and paper to cover the windows to his cell so that the guards could not see inside. The officer who was filming tried to reason with Mr. Mayer, explaining that disobeying commands, resisting, and behaving as he was would only make the situation worse. Mr. Mayer responded, "I don't care! Listen, you motherfuckers think I give a fuck!" A sergeant arrived and asked that Mr. Mayer take down the papers from his window—he refused. The sergeant explained that he was only making the situation worse for himself by escalating. Mr. Mayer was warned that he would be sprayed with irritant, but he did not care. Mr. Mayer repeatedly refused to take down the paper and allow the guards to handcuff him, saying "No, bring it on, squad up. Come in here."

Jail staff assembled a team to forcibly remove Mr. Mayer from his cell. During that time, Mr. Mayer was making his own preparations. With the windows of his cell covered, as well as the camera within, the guards could not see what Mr. Mayer was doing. However, he proudly announced (yelling through the walls to another inmate), "I got everything ready!" Mr. Mayer peered out from behind a piece of paper and to the officer who was filming said, "Hey, before we get intimate in this motherfucker I just wanna make sure who their names are. It's a respect thing." When the officer refused to give his name, Mr. Mayer said, "I'm just curious about your name. I just wanna let you know it's not personal."

Officers continued to try and reason with Mr. Mayer to resolve the situation peacefully. They explained that he was being moved because he had threatened to throw urine on staff. Mr. Mayer tried to deny the threat and asked for an administrative hearing. He was told he could have one after he moved. Mr. Mayer then reversed course, screaming:

> Hey, you know what? I'll tell ya straight up, yeah, I said that shit! You guys want me to admit to that shit? Ok. You guys want to say I did that shit? I'll just admit to it. Sure, I said it.

> Guess what? If I'm being accused of sayin' something, doin' something, I might as well say and do it. Now, go get your pepper spray, get your crowd control, the big canister, and squad up.

Officers, including victims M.W. and T.B., assembled outside of Mr. Mayer's cell and prepared to forcibly remove him. A sergeant warned Mr. Mayer this was his last chance to comply and if he did not, he would be sprayed. Mr. Mayer responded by repeatedly shouting, "Suck my dick!" Officers then deployed chemical irritant into

Mr. Mayer's cell. As Mr. Mayer coughed, the sergeant explained that if he uncovered the windows and "hooked up" (i.e., allow them to handcuff him), they would get him out of the cell and treat him for the irritant. Mr. Mayer replied, "Hell no!" Officers deployed the irritant again and Mr. Mayer coughed harder. The sergeant asked if he was ready to come out, and Mr. Mayer finally replied that he was. But this was simply a ruse to allow Mr. Mayer to execute his actual plan—assault the waiting guards by hurling his feces on them.

Mr. Mayer tore down some of the paper stuck to his cell windows and the guards moved in to handcuff him. As the sergeant unlocked and lowered the slot on the cell door, to allow Mr. Mayer to put out his hands and be handcuffed, Mr. Mayer executed his planned assault. Mr. Mayer quickly stuck his hand through the slot and hurled his feces on guards M.W. and T.B., who were immediately outside the door. Although Mr. Mayer's fling is not visible on the video because a guard is standing between him and the camera, there is no doubt what happened. Mr. Mayer gleefully yelled, "I got 'em, I got 'em with shit!" The officers outside the door are heard exclaiming that Mr. Mayer threw feces on them. After Mr. Mayer was secured and moved, Officers M.W. and T.B. both reported that Mr. Mayer's feces struck them. Pictures of their equipment, clothing, and skin all show visible feces stains. On the ground just outside Mr. Mayer's cell door was a pile of excrement, which was also photographed.

Unsurprisingly, as a result of the assault, Mr. Mayer faced consequences within the Jail. Mr. Mayer did not want to suffer those consequences (e.g., being

placed in segregation, with limited access to amenities and services). In his administrative proceedings, he struck a somewhat consolatory tone. In an appeal of the administrative punishment he received for the assault, Mr. Mayer did not deny the assault happened, or argue he was innocent. Instead, he wrote:



be able to defend myself. I'd like to contest the 82-days I recieved in lock down. I understand the alledged rule violations are serious in nature, and some accountability here is in order, but since I've had no serious trouble since 4-5-19 when I got here to Sherburne County Jail, I believe 82-days lockdown is a bit excessive. I would like to ask for a max of 60 days lock down, thank you for your time in this matter.

Receiving Staff Name:     Badge#: 389     Date: 7-30-19

When his meager, false contrition did not work and administrative consequences were imposed, Mr. Mayer was enraged. In his calls and letters he did not protest his innocence, but instead repeatedly explained how he planned to further escalate the situation. On August 5, 2019, Mr. Mayer told his mother:

> Listen, I don't care if I live or die. I don't care. That's one thing about it. That, that, that, that's the advantage I got on them. These motherfuckers want to go home, they want to go home to their families. Me? It's not that I don't want to go home, myself, *[unintelligible]*, but whether I live or die, it doesn't bother me. Live or die, I don't care. Shit, they afraid to die.
>
> …
>
> You know, hey, I'm not the one, I tell 'em all the time, look at my institutional behavior. I'll get butt naked in my motherfuckin' cell, I'll shit on the floor, I'll rub shit all over me again and make them come in my cell.

In a call with his brother, Steven, on August 13, 2019, Mr. Mayer found his assault on M.W. and T.B. entertaining:

> Travis:     I guess they call me the shit slinger. *[laughing]*
>
> Steven:     I can't imagine why.

| Travis: | I, I can't imagine why either.  I mean, only an animal would do that. |

Mr. Mayer was not so entertained after being federally charged for assaulting M.W. and T.B.  In calls with his mother and brother he continued threatening to escalate his behavior, assaulting Jail staff again or even murdering them.  But Mr. Mayer also recognized he was guilty of the charged assault.   On at least five separate occasions following the July 26, 2019 assault, Mr. Mayer admitted he was guilty of that crime, or that he would likely be convicted.

Despite the overwhelming evidence against him, and his acknowledgement of his guilty, Mr. Mayer would not go down without a fight.  He focused his energy on figuring out how he would "get away with it" again, as he had in Freeborn.  In a call to his mother on October 13, 2019, Mr. Mayer game-planned some impermissible defenses and means to achieve an acquittal:

| Travis: | They got the right person, like I said, you know.  They ain't seen me mad, mad, or, they ain't seen me mad.  They seen me irritated.  That was me irritated over there, but that wasn't shit.  I didn't try and hurt anybody that fuckin' day. |

| Cindy: | I know you didn't, Travis. |

| Travis: | Irritated, that was me irritated.  Now, they got me mad.  And that's not a good thing, for anybody. |

| Cindy: | Yeah, I know Kyle.  I know you. |

| Travis: | Yup, like I said, you guys wanna play with the *[unintelligible]* thing, go ahead.  Because anything, like I said, then we'll go to the jury and they'll ask, "Well, why did you do this?"  Right here, jury ain't supposed to look at sympathy, but I guarantee they're gonna have sympathy, |

|  |  |
|---|---|
|  | and they'll go, "Why were they holding his mail? Why you fuckin' with his mail? Especially coming from his mom.'" |
| Cindy: | Exactly. |
| Travis: | I guarantee some of the jurors are going to be mothers and they're gonna be like, "What the fuck is wrong with them?" You know. |
| Cindy: | Well, I hope they do. I really do. I hope a lot of them do, cause you know, I would if I was on a jury, I would wonder, "Why they keepin' mail from this kid's mom?" Or anybody in general. |
| Travis: | "What happened to you? Why'd you snap out?" You know, it's like this. I'm tryin' to tell 'em, it's not something I'm planning on doing. It, they're, they're pushing me and I can feel it coming on. Once I get to that point, I have no control over that shit, I blackout and the next thing I know it, somebody's hurt. I don't remember what happened. People, they go, "Were you drunk? Were you high?" No! No. What are you talkin' about? Like, seriously, like I totally blackout. They push me to that point, I snap out. Everybody has a limit. |
| Cindy: | Yeah, I hear ya. |
| Travis: | I can be, I'm high strung, yes, but I'm still, you know, kinda high strung, I'm still calm and shit. I like to joke around and chill. You know. |

Above all, Mr. Mayer remained proud of his assault and committed to repeating, or escalating, his conduct. In a call with his mother on October 18, 2019,[2] Mr. Mayer said:

|  |  |
|---|---|
| Travis: | They said, "This is supposed to expedite the process." Well, I said, "That's gonna speak of itself when my new mail, because my Mom." Even if, even if your letter don't go out |

---

[2] Mr. Mayer's threats in this phone call were not idle. That same day, Mr. Mayer assaulted Jail staff again by throwing liquid on a guard when they attempted to remove him from his cell.

until tomorrow, Saturday, even if, I should still have it by Thursday.

Cindy: No shit.

Travis: I should still have it by next Thursday. So, we'll, we'll probably be at this again next Thursday. Umm, like I said …

Cindy: Jesus.

Travis: Like I said, all I'm gonna say is, I really gotta use the bathroom right now. *[laughing]*

Cindy: Oh, okay.

Travis: No, no, no, I'm gonna hold it for a reason. So …

Cindy: No, Travis, go to the bathroom.

Travis: No, no, no, no.

Cindy: Travis, go to the bathroom, in the toilet.

Travis: No.

Travis: But, I do love you though, I miss you.

Cindy: I love you too. Please, please Travis, I worry about you not being safe.

Travis: Oh, I'm safe, like I said. Now, are they gonna be safe? No! One of them's getting fucked, hey, one of them's getting' done up, one of them's getting done up. I got it all ready, somebody's getting done up. Those vests ain't gonna stop me. The shank vests they got, they ain't gonna stop this. This is going through. One of them's going to the hospital today. *[unintelligible]* So, …

Cindy: I love you.

Travis: I love you too. And, I'm gonna try for one of their fuckin' lungs.

| Cindy: | *[sighing]* |
|---|---|
| Travis: | That's the only way, I, I don't know any other way *[unintelligible]*, like damn, wait a minute … |

Mr. Mayer now stands charged with one count of assaulting a federal officer by acts involving physical contact in violation of 18 U.S.C. § 111(a).

## II.    THE EVIDENCE

The Government expects to prove Mr. Mayer's guilty primarily through four categories of evidence. First, the Government will call witnesses from the Sherburne County Jail to testifying about events before, during, and after the assault on July 26, 2019. The Government's second category of evidence, photographs and videos of the time surrounding the assault, will be introduced through these witnesses. The Government has transcribed the audio of most of these videos and synced those transcriptions to assist the jury in understanding the evidence.

Third, the Government will present numerous forms of Mr. Mayer's own statements. These include Mr. Mayer's phone calls and letters from the Jail, as well as kites and grievances he filed. Again, the Government has transcribed Mr. Mayer's phone calls and synced those transcripts with the audio to assist the jury in understanding the evidence. Finally, the Government will present evidence—such as witness testimony, certified records of conviction, complaints, pleas and transcripts—related to Mr. Mayer's conduct while incarcerated at the Freeborn County Jail, along with his prior convictions for criminal property damage and tampering with a fire alarm during that time.

## A. Admissibility of Witness Testimony and Photographs.

The testimony of witnesses with firsthand knowledge of Mr. Mayer's conduct and statements before, during, and after the assault at Sherburne is relevant and not unduly prejudicial. *See* Fed. R. Evid. 401, 402, 403, and 602. Photographs of the aftermath of Mr. Mayer's attack, introduced through the witness who took them, are similarly relevant and not unduly prejudicial. *See* Red. R. Evid. 401, 402, 403, and 901(b)(1).

## B. Admissibility of Cell Extraction Videos.

The videos of the moments before, during, and immediately after Mr. Mayer's cell extraction and assault are also admissible.[3] First, these videos are relevant and not unduly prejudicial as they relate directly to Mr. Mayer's planning, execution, and subsequent admissions about the assault and his threats against Jail staff. Fed. R. Evid. 401, 402, and 403. Second, they contain primarily statements by Mr. Mayer, which are not hearsay as statements of a party opponent. Fed. R. Evid. 801(d)(2); *United States v. Stong*, 773 F.3d 920, 923–24 (8th Cir. 2014) (holding that the defendant's statements in a video recording were not hearsay and were admissible). Third, they contain present sense impressions, excited utterances, and statements regarding sensory and physical condition by Jail staff related to Mr. Mayer's assault—specifically, that Mr. Mayer threw feces on one or more of the guards. These

---

[3] There are two video exhibits the Government intends to offer. One is approximately 40 minutes in length and covers the time leading up to Mr. Mayer's cell extraction on July 26, 2019. The second is approximately 16 minutes in length and covers the cell extraction and the debriefing of Jail staff immediately after. Although the Government only intends to play snippets from these videos at trial, it intends to offer the videos in their entireties as exhibits for the jury to view.

statements are admissible as exceptions to the hearsay rule. Fed. R. Evid. 803(1), (2), and (3).

For any statements by Jail staff in these videos not covered by one of the aforementioned rules or exceptions, those statements are not offered to prove the truth of the matter asserted, but rather to show their effect on the listener, Mr. Mayer, and to contextualize the events unfolding on screen. Fed. R. Evid. 801(c); *United States v. Wright,* 739 F.3d 1160, 1170 (8th Cir. 2014) ("A statement offered to show its effect on the listener is not hearsay." (citation omitted, cleaned up)); *United States v. Escobar*, 909 F.3d 228, 246 (8th Cir. 2018) (statements of non-testifying witness in recording of conversation with the defendant were not hearsay because they were not offered for the truth of the matter asserted, but rather to contextualize the defendant's statements); *United States v. Spencer*, No. 07-cr-174 (JRT/JJG), 2008 WL 4104693, at *9 n.7 (D. Minn. Aug. 29, 2008) (same), *aff'd*, 592 F.3d 866 (8th Cir. 2010); *United States v. Russell*, No. 1:14-CR-02563-PJK-1, 2018 WL 1997288, at *2 (D.N.M. Apr. 26, 2018) (statements by FBI agent regarding another witness' comments during interview with the defendant were not offered for the truth of the matter asserted, but rather to show their effect on the defendant and contextualize the interview).

For the vast majority of each video, and all of the snippets the Government intends to play for the jury at trial, the Government has created a transcript of the audio, which is synced with the video, to assist the jury in understanding the

evidence.  The Government has proposed a limiting instruction that explains the role of the transcripts to the jury.

On May 8, 2020, the undersigned sent these transcripts to defense counsel along with a request that counsel: (1) identify any discrepancies or perceived inaccuracies; (2) note any objections to the portions of the videos the Government intended to play; and (3) tell the Government if there were any portions of the videos that Mr. Mayer wished to be played.  The undersigned received no response to this inquiry.  On August 28, 2020, the undersigned spoke with defense counsel and again raising the issue of the transcripts and what portions of the videos could/would be played.  Defense counsel did not identify any inaccuracies in the transcripts, any objections to the videos themselves, or any portions of the videos that Mr. Mayer wished to be played.[4]  *See* Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 2.06A, cmt. 1 (2017) (describing the preference for a single "stipulated" transcript, but detailing that each side may produce its version of any disputed portion and put forward evidence regarding that section).

### C.    Admissibility of the Defendant's Jail Calls and Letters.

The calls made by, and letters written by, Mr. Mayer while incarcerated at the Sherburne County Jail are similarly admissible.  As to the letters, they are relevant and not unduly prejudicial as they relate directly to Mr. Mayer's motivation, planning, execution, and subsequent admissions about the assault and his threats

---

[4] To be clear, defense counsel did not agree to the admission of the videos, or expressly state he found no inaccuracies in the transcripts.  Rather he did not identify any inaccuracies or objections.

against Jail staff. Fed. R. Evid. 401 and 402. The Government has redacted the portions of these letters that are irrelevant or unduly prejudicial, such as conversations about purely personal matters, references to Mr. Mayer's other federal charges, and his racist, sexist, and derogatory remarks about people unaffiliated with this case and his incarceration. Thus, the probative value of the redacted letters far outweighs any unfair prejudice. Fed. R. Evid. 403. These letters consist exclusively of Mr. Mayer's own statements and therefore are not hearsay. Fed. R. Evid. 801(d)(2). They will be introduced through the Jail's investigator and/or the FBI case agent, who were responsible for scanning them and reviewing their contents. Fed. R. Evid. 901(b)(1).

Mr. Mayer's calls from the Jail are also admissible. First, the Government has edited the calls to only the portions that are relevant to Mr. Mayer's motivation, planning, execution, and subsequent admissions related to the assault and his threats against Jail staff. Mr. Mayer's calls often last nearly 20 minutes and are filled with discussions that are irrelevant (e.g., personal and family matters) or unduly prejudicial (e.g., his pending child exploitation case, racist and sexist comments, rants about past drug use and crimes). The Government has removed these sections so that just the relevant, and not unduly prejudicial, portions remain and intends to offer the edited calls as exhibits at trial. *See* Fed. R. Evid. 401, 402, and 403.

Second, the calls consist primarily of statements made by Mr. Mayer and therefore are not hearsay. Fed. R. Evid. 801(d)(2). Third, the statements in the calls

by individuals other than Mr. Mayer, generally his mother (Cindy) or brother (Steven), are not offered for the truth of the matters asserted, but rather to show their effect on the listener, Mr. Mayer, and to contextualize his statements and the call for the jury. *See* Fed. R. Evid. 801(c); *Wright,* 739 F.3d at 1170; *Escobar*, 909 F.3d at 246.

Like with the videos, the Government has prepared transcripts for the portions of Mr. Mayer's calls that it intends to play at trial (and offer as exhibits), and synced those transcripts with the calls' audio. This will assist the jury in understanding the evidence. The Government has proposed a limiting instruction that explains the role of the transcripts.

On May 22, 2020, the undersigned sent these transcripts to defense counsel along with a request that counsel: (1) identify any discrepancies or perceived inaccuracies; and (2) note any objections to the portions of the calls the Government intended to play. The undersigned received no response to this request. On August 28, 2020, the undersigned called and spoke with defense counsel, again raising the issue of the transcripts and what portions of the calls could/would be played. Defense counsel did not identify any inaccuracies in the transcripts, any objections to the call segments, or any portions of the calls that Mr. Mayer wished to be played.[5] *See* Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 2.06A, cmt. 1 (2017) (describing the preference for a single "stipulated" transcript, but detailing

---

[5] Again, defense counsel did not agree to the admission of the calls, or expressly state he found no inaccuracies in the transcripts. Rather he did not identify any inaccuracies or objections.

that each side may produce its version of any disputed portion and put forward evidence regarding that section).

### D. Admissibility of Intrinsically Intertwined and 404(b) Evidence.

The Government intends to offer evidence of the following at trial: (1) Mr. Mayer's conduct while incarcerated at the Freeborn County Jail from approximately September of 2018 to April of 2019; (2) Mr. Mayer's prior convictions for tampering with a fire alarm and criminal property damage while incarcerated at the Freeborn County Jail in 2019; (3) Mr. Mayer's acquittal on a charge of fourth degree assault in Freeborn County in May of 2019, but to which he subsequently admitted he was guilty; and (4) Mr. Mayer's numerous threats to Sherburne County Jail staff as well as other disciplinary incidents during his incarceration at that facility. The Government will file a separate motion addressing the admissibility of this evidence.

### E. Impeachment of the Defendant.

Should Mr. Mayer testify, in addition to the evidence addressed in a separate motion, the Government intends to inquire about: (1) his prior testimony in this matter; and (2) holdings by this Court, and the Court in Mr. Mayer's other pending federal case (19-cr-96 (WMW/HB)), regarding his credibility and the veracity of his testimony (*see* Dkt. 37 at 2 and 6 n.4 and Dkt. 40 at 1–2; *in* 19-cr-96 (WMW/HB), Dkt. 112 at 8–9 and Dkt. 120 at 6 and 8).[6] Such inquiry is permissible under Federal Rule

---

[6] This is by no means an exhaustive list of the evidence the Government intends to use to impeach Mr. Mayer, should he testify. Some additional items of evidence and areas of inquiry are addressed in a separate motion. Still others are not addressed in the Government's pretrial filings.

of Evidence 608(b) as it goes to Mr. Mayer's character for untruthfulness. Depending on Mr. Mayer's testimony, the Government may seek to introduce his prior testimony and the rulings of this Court, and the Court in 19-cr-96, pursuant to Federal Rule of Evidence 613(b).

## III. PRETRIAL LEGAL ISSUES (OTHER THAN THOSE ADDRESSED IN SEPARATE MOTIONS)

### A. The Need for a Frye/Lafler Colloquy.

On February 26, 2020, the Government extended a plea offer to Mr. Mayer in this matter. It set an expiration date for that offer of 5pm on March 13, 2020. The Government never received a response. On March 31, 2020, the Government inquired with defense counsel whether Mr. Mayer had rejected the offer. That same day, defense counsel confirmed Mr. Mayer's rejection. At no time since has Mr. Mayer expressed any interest in negotiating a plea.

At the pretrial conference, the Government requests the opportunity to put the terms of its plea offer to Mr. Mayer on the record, as well as his rejection of that offer, through a *Frye/Lafler* colloquy.

### B. The Defendant's Refusal to Enter Into Any Stipulations.

On August 21 and September 9, 2020, the Government proposed a number of stipulations to the defense. Any of these stipulations would speed trial by resolving seemingly uncontroversial issues, a fact that would benefit all sides, the Court, and the jury given the pandemic. Specifically, the Government proposed stipulations on the following:

- Sherburne County correctional officers are federal officers for the purpose of the charging statute, 18 U.S.C. § 111.

- Sherburne County Correctional Officers M.W. and T.B. were performing duties pursuant to a contract with the federal government at the time of the alleged assault.

- Mr. Mayer's status as a federal inmate at Sherburne County Jail and an instruction that the jury should not speculate as to the nature of his other federal charges.

- Mr. Mayer was the source of the various calls and letters the Government intends to offer at trial.

- The cell extractions videos the Government intends to offer are authentic and admissible.

Mr. Mayer did not negotiate or propose alternatives to any of the Government's stipulations—he simply rejected them all. Thus, the Government will have to call more witnesses and elicit more testimony, prolonging trial.

### C.     Precautions Against A Mistrial or Unnecessary Continuance.

Mr. Mayer has no apparent defense[7] and the evidence against him is overwhelming. Instead, his "plan" appears to be a campaign for a mistrial. Especially given the omnipresent concerns and limitations related to the COVID-19 pandemic, the Court should be alert for, and work to prevent, the Defendant's efforts in this regard.

### 1.     The Defendant's refusal to notice a defense and apparent plan for trial by ambush.

Mr. Mayer has produced no evidence to the Government, nor noticed any defense. On September 9, 2020, pursuant to the Court's order, the Government

---

[7] Nor has he noticed any specific defenses, as requested by the Government (Dkt. 11), ordered by the Court (Dkt. 27), and required by Federal Rules of Criminal Procedure 12.1, 12.2, and 12.3.

provide defense counsel with exhibit and witness lists. Defense counsel responded by claiming, "At present, I do not know whether I will put on a case, and do not anticipate making that decision until after the Government's case in chief. I therefore have no exhibit or witness lists to share at this time." This claim is dubious at-best.[8]

The charge again Mr. Mayer is not a complicated one. The Government's case has never been a secret or a mystery. The defense has had the vast majority of the evidence the Government intends to offer at trial for over a year. Noticing <u>potential</u> exhibits and witnesses in no way infringes on Mr. Mayer's right to rely on the presumption of innocence not to present a case.[9] However, if Mr. Mayer were to present evidence, such notice would allow the parties, and the Court, to resolve evidentiary issues beforehand, thereby hastening the trial and properly valuing the jury's time and safety.

Regardless, Mr. Mayer chose a different path. Now, should he offer any evidence or witnesses, they may not be admitted without first showing good cause. (Dkt. 45 at ¶¶ 3(d), 4(a)). The Government asks that Mr. Mayer be held to this standard at trial and that the Court be skeptical of any claim that he "couldn't have known" the Government's case and evidence are what is presented.

---

[8] The Government notes that Mr. Mayer apparently disagrees with defense counsel about whether there is a planned defense. On August 28, 2020, in a call with his mother discussing his upcoming trial, Mr. Mayer explained, "there's a couple of things that the government just doesn't know, and uhhh, basically, there's basically like a 99% chance that I cannot be found guilty."

[9] Just because an exhibit is listed, or a witness noticed, of course does not require that the party actually call that witness or offer the exhibit.

## 2.     The Defendant's intent to disrupt trial.

Mr. Mayer has made abundantly clear that should trial not being "going his way," he plans to disrupt it, presumably in the hopes of causing a mistrial.  Mr. Mayer has a history of acting out in court.  On a phone call with his mother on May 22, 2020, Mr. Mayer bragged that during his 2012 trial for criminal sexual conduct involving his attempted rape of a young girl in Le Sueur County, he told the prosecutor to "suck his dick."  At sentencing on his subsequent conviction in that case, after receiving a sentence that represented an upward departure, the transcript shows Mr. Mayer yelled, "You punk ass bitch!"

Leading up to his trial in Freeborn County for fourth degree assault, on a call with his mother on May 18, 2019, Mr. Mayer laid out his plans to disrupt the proceedings:

> But I'm probably gonna punch the prosecutor though … Even if I do that, the charge doesn't matter because I won't be convicted by the time this is all done with and anything I get on the state level is gonna be ran concurrent with my federal level ... plus this is gonna be a state charge and that's only probation for that anyway ... It's not gonna hurt me any.
>
> …
>
> Plus I just really really, really wanna punch the bitch [the prosecutor] cause no one's ever done it, you know you can tell she's the type of woman who's never had a man put her in her place ... she's a dumb fucking cunt, she's a dumb stupid ho, slap her one time in the mouth. I mean I'm gonna get tased ...
>
> …
>
> I told him [his state public defender], "I'm gonna catch a fucking charge." I might just punch him.  If I do that before the end of the jury trial while the jury is still in there, I'll get a mistrial.  That's gonna bias the jury, if they allow them to come back and find me guilty, that's just an automatic reversal, they're gonna declare a mistrial.  That's all I gotta

do, it's a guaranteed thing. I'm probably gonna punch my lawyer for all the shit he did, he's a fuckin douchebag.

In dozens of calls and letter, Mr. Mayer detailed his planned disruptions in this matter and practiced the vulgar and threatening language he might use. Below are just a few of examples from his jail calls:

- **April 22, 2019**: "Depends on how I feel, you know me … Depends on what I do in the courtroom, if they fuckin ban me or whatever, fuck it I'm not going. I'll go in the ground first. I'd rather be cremated. Just being realistic. You know I give everybody a heads up before I do shit."

- **May 18, 2019**: "Maybe a fuckin US Marshal will drop a pistol and go off and hit me. … I'm just not thinking correctly right now, like I said, I'm thinking about going after a prosecutor and that's only a 4th degree assault too. … At this point, I really don't care."

- **July 22, 2019**: "Oh, and by the way, Michael Sieg, if you are listening to this and transferring it to the Feds, fuck you Michael Sieg, I'm still gonna fuck your wife and your daughter. I may even let you watch. … And the Feds, suck my dick. Suck my motherfuckin' dick, Feds! And U.S., Melinda Williams and Alex Chiquoine from U.S., United States Attorney's Office, yeah, you guys both know you're transgender as fuck."

- **September 13, 2019**: "One way or another, I ain't gonna be here long, even if they were to convict me and give me a shitload of time, I'm gonna appeal this shit and if the appeals don't work, I'm gonna start stabbing motherfuckers up in prison, guards, staff, inmates. … Like I said, that bitch will be the first one to lose her life if I get taken away. … They're all being watched, the prosecutors are being watched the witnesses are being watched."

- **October 22, 2019**: "I'm not gonna kill myself, I know that for a fact. I would make someone do it, I would make the police do it. I'm not at that point because shit can get better."

- **March 26, 2020**: "I just want to say this on the phone for Alex Chiquoine and Melinda Williams, who are going to be listening to this, Alec Chiquoine and Melinda Williams, I hope you guys and all your family, and Alec Chiquoine, I hope your newbon baby, the premature one, all catch the coronavirus and die slow. I just wanna say that, because they're listening."

- **May 1, 2020**: "It is what it is, like I said, you know, I get the last laugh always. I'm always gonna get the last laugh. When I win these charges at trial

[*stammering*] I can't get into everything that [*unintelligible*] because, you know, ears are listening."

- **June 9, 2020**:  "Tell the government they can kiss my ass.  Hear me Chiquoine?!  Kiss my ass, Chiquoine!  Kiss my ass Williams!  They'll be callin' my lawyer and my lawyer will be talkin' to me about that. … I just said kiss my ass, that's not threatening."

- **August 31, 2020**:  when discussing court restrictions related to the COVID-19 pandemic, "Maybe I'll get lucky when I go to court, who knows.  Maybe I'll tell people, 'Hey, hey, hey, hey, fuck it, $500 whoever coughs on me.  Just cough.' [*laughing*]"

The Government asks that the Court warn Mr. Mayer that should he attempt to disrupt the trial, and especially if he threatens any of the witnesses, court staff, or trial participants, he may lose the privilege of being present during the proceedings. Mr. Mayer does not have an absolutely right to be in the courtroom, especially if he is being distributive and attempting to intimidate the participants.  *United States v. Williams*, 431 F.3d 1115, 1119 (8th Cir. 2005).  As the United States Supreme Court held:

> Although mindful that courts must indulge every reasonable presumption against the loss of constitutional rights, we explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.

*Illinois v. Allen*, 397 U.S. 337, 343 (1970).  If it becomes necessary to remove Mr. Mayer from the courtroom, he can observe the trial via Zoom or closed-circuit television from the U.S. Marshal's cell block, which will sufficiently protect his right to be present under the circumstances.  *See Williams*, 431 F.3d at 1119-20.

## IV.   CONCLUSION

The Government is prepared to expeditiously try a well-organized case on what is an uncomplicated matter—Mr. Mayer planned and then executed an assault on Sherburne County correctional officers M.W. and T.B. by throwing his feces on them and then admitted what he did.   Mr. Mayer, on the other hand, is prepared to needlessly and impermissibly complicate the proceedings, whether by refusing to notice any witnesses or exhibits, lodging untimely and legally incorrect challenges to the Government's evidence, and/or cause disruptions during trial.   The Government asks that the Court not indulge Mr. Mayer's efforts.

Dated: September 16, 2020                         Respectfully Submitted,

                                                  ERICA H. MacDONALD
                                                  United States Attorney

                                                   */s/ Alexander D. Chiquoine*
                                         BY:      ALEXANDER D. CHIQUIONE
                                                  DAVID P. STEINKAMP
                                                  Assistant U.S. Attorneys