UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 19-cr-244 (NEB/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TRAVIS KYLE MAYER,<br><br>Defendant. | GOVERNMENT'S MOTION AND MEMORANDUM TO ADMIT INEXTRICABLY INTERTWINED AND RULE 404(b) EVIDENCE |

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Alexander D. Chiquoine and David P. Steinkamp, Assistant United States Attorneys, hereby submits its Motion in Limine and Memorandum regarding the admission of intrinsically intertwined bad acts and Rule 404(b) evidence in the above-entitled matter.

The Government moves for the admission of the evidence described below because the Defendant's other bad acts are intrinsic to the charged offense, but also independently admissible under Rule 404(b) because they show motive, opportunity, intent, preparation, planning, absence of mistake, and lack of accident.

**I.     The Charge.**

The Defendant ("Mr. Mayer") is charged with assaulting a federal officer. To convict Mr. Mayer of assaulting a federal officer the Government must prove beyond a reasonable doubt:

One, the Defendant forcibly assaulted, resisted, opposed, or impeded Sherburne County Jail Correctional Officer M.W. or T.B.;

Two, the assault was done voluntarily and intentionally;

Three, the assault involved physical contact with the victim; and

Four, at the time of the assault, Sherburne County Jail Correctional Officers M.W. and T.B. were doing what they were employed by the federal government to do.

## II.     Factual Background.

Mr. Mayer has been detained at the Sherburne County Jail (the "Jail") since April 2019 on charges federal child exploitation charges. *United States v. Mayer*, 19-cr-96 (WMW/HB).

During his incarceration at the Jail, the Defendant has had significant behavioral and disciplinary issues. Beginning in late June of 2019, the Defendant was upset because he believed the Jail was "fuckin' with" his mail (i.e., that his mail was being delayed). For weeks, Mr. Mayer's rage increased and he repeatedly made threats to Jail staff, directly to the correctional officers and also in his jail mail and calls. His threats included: (1) that he would throw urine, feces, and/or other bodily fluids on staff; (2) that he would physically attack staff by punching, kicking, or stabbing them; (3) that he would kill staff; and (4) that he would sexually assault staff's family members. Mr. Mayer was clearly embolden by the fact that just months before, he was acquitted on a state assault charge for throwing urine on a correctional officer while incarcerated at the Freeborn County Jail—a fact he proudly and repeatedly referenced as part of this threats to Sherburne Jail staff.

On July 25, 2019, threatened a correctional officer that if his various demands regarding his jail communications were not met, he would throw urine and/or feces on staff. Due to his ongoing behavioral issues and this threat, on July 26, Jail staff prepared to move Mr. Mayer to a new cell. Mr. Mayer was told he was being moved, instructed to come to the cell door, produce his hands so they could be handcuffed, and

2

prepare for the move. Mr. Mayer refused. Instead, he covered the windows into his cell, as well as the camera within, all while yelling vulgar insults at the guards. Numerous Jail staff, including two correctional supervisors, asked Mr. Mayer to comply with their orders and warned him that if he did not, he would be forcibly removed from the cell. Mr. Mayer refused and continued to engage in disruptive and destructive behavior within his cell, screaming at staff and telling them to "squad up" and come in to get him.

The guards prepared for a forcible cell extraction. An entry team in riot gear assembled at the door to Mr. Mayer's cell, which was fully covered by paper at this point. Mr. Mayer was given a final opportunity to comply and move peacefully and again warned that if he did not, he would be sprayed with a chemical agent and forcibly moved. He refused, shouting at the guards and taking the paper down long enough to show them his naked rear end through the window.

Correctional officers deployed chemical irritant into Mr. Mayer's cell. Mr. Mayer coughed, but continued to shout obscenities at the guards and refused their commands. A second shot of chemical agent was deployed and Mr. Mayer coughed harder. Guards asked if he was willing to comply so they could take him out of the cell and treat him for the irritant and Mr. Mayer indicated he was, removing some of the paper from his cell windows.

As officers opened the pass-through hatch in the door, Mr. Mayer stuck his hand out and flung feces on the first two officers standing by the door. The feces got on their riot gear, clothing, and the bare skin of their forearms.

Mr. Mayer crowed: "I got 'em, I got 'em with shit!"  Guards grabbed his arms through the open slot, restrained him, and removed him to the booking area of the jail. While being processed in the booking area of the jail, Mr. Mayer repeatedly stated that he would throw feces on the guards again if given the opportunity.  Mr. Mayer asked questions about which guards were involved with his extraction so he "knew who to throw shit on next time."  Mr. Mayer also smeared feces over the window of his booking cell.  When a guard asked him if he would clean it off, Mr. Mayer responded, "I'm done with assaults.  I'm going to start killing you guys."  He then declared, "Next thing I'm going to start throwing on you is my blood!"

### III.  The Defendant's Other Bad Acts.

Prior to his incarceration at Sherburne County Jail on federal child exploitation charges, Mr. Mayer was incarcerated at the Freeborn County Jail on related state charges from approximately September 2018 to April 2019.  During his incarceration at Freeborn, Mr. Mayer engaged in numerous bad acts and criminal conduct. Furthermore, besides his assault on M.W. and T.B. at Sherburne County Jail on July 26, 2019, Mr. Mayer engaged in numerous other bad acts, including other assaults, threats, disruptive behavior, and property damage within that facility.

### A.   January 11, 2019: Throwing urine on a Freeborn County correctional officer.

On January 11, 2019, Mr. Mayer threw urine on a Freeborn County correctional officer.  As the guard was collecting his food tray, the Mr. Mayer threw a cup of urine on the guard, covering the front of his clothing.  Mr. Mayer was charged with Fourth Degree Assault in Freeborn County for this conduct.

After he was transferred to the Sherburne County Jail to face federal child exploitation charges, Mr. Mayer said the following about his pending Freeborn County assault charge in a jail call to his friend on April 20, 2019:

> Oh yeah, they were gonna move us, like I said, I hate having to keep fuckin' moving, you know. And they were talkin' about moving us back there Monday. And then, I don't know when they're gonna let us go to, fuckin' [*unintelligible*]. They got me on that max shit cause I threw that piss on the CO, allegedly, whatever. [*laughing*]

Mr. Mayer believed he would be convicted of Freeborn assault. In a May 18, 2019 jail call with his brother (Steven), when asked how he thought the trial on that charge would go, Mr. Mayer responded:

> Travis: Oh yea, I'm gonna get convicted. I mean, you have, they have two witnesses. They have a correctional officer that I allegedly threw piss on and then the cop who reported he smelled urine. Then you got me.
>
> Steven: Right.
>
> Travis: Who do you think they are gonna believe? [*laughing*] You know. Even though the dumbass washed his uniform. I mean, he claims I threw piss on him, you still gotta prove it. But…

Remarkably, despite even Mr. Mayer's own prediction, he was acquitted of the Freeborn assault at a jury trial in late May of 2019. Upon being returned to Sherburne County Jail, Mr. Mayer was elated, bragging about how got away with the crime. During a jail call on July 10, 2019, with his brother, Mr. Mayer described how he had just "beat trial" by being acquitted, despite the fact that he was "guilty as fuck."

Unfortunately, Mr. Mayer's Freeborn acquittal encouraged him to act out within Sherburne County Jail. On July 25, 2019, the day before the assault charged in the Indictment, Mr. Mayer told a guard that he wanted them to stop "fuckin' with" his mail and that he did not want to move cells any more. Mr. Mayer indicated that he had a

5

cup with a feces-urine mixture in it and that he throw it on the guards if his demands were not met. He stated that he was not scared to throw things on guards and said, "I've done it to other officers at other jails. Guy got a face full of piss!"

### B. January 12, 2019: Flooding the toilet, smearing feces on his cell walls and threatening Freeborn County correctional officers.

On January 12, 2019, while incarcerated at the Freeborn County Jail, Mr. Mayer was going to be moved due to the previous day's assault. He was angry and used a shirt to flood the toilet in his cell, causing damage. In addition, he defecated on the floor of his cell and smeared the walls of his cell with feces. When officers arrived, he threatened to throw feces at them.

### C. March 16, 2019: Breaking off a sprinkler head in the Freeborn County Jail, smearing feces on the wall of his cell, and threatening correctional officers.

On March 16, 2019, while incarcerated at Freeborn County Jail, Mr. Mayer broke off a fire prevention system sprinkler head in the jail. When he was approached by guards, he told one that he (the officer) had "gotten his ass kicked before" and that the officer should "watch out now." Mr. Mayer also said that he would be smearing feces on the wall of his cell. Later, he flooded his cell by plugging the toilet with a shirt, and kept his promise, smearing feces on the wall of his cell. When confronted by jail staff about his conduct, Mr. Mayer said that he could assault more staff because any penalties he received would "run concurrent," and he "wouldn't get any more time."

Mr. Mayer was charged in Freeborn County with two misdemeanor counts of Damage to Property and Tampering with a Fire Alarm System related to this conduct. Mr. Mayer pleaded guilty to both charges on March 18, 2019 and was sentenced to 60 days on each count.

After being taken into federal custody and moved to Sherburne County Jail, Mr. Mayer proudly admitted what he had done in Freeborn. In a jail call with his mother (Cindy) on April 19, 2019, Mr. Mayer said:

> Travis: The jail, like I said, they're still pissed off because they're not gonna get no money outta me for the fuckin' sprinklers. I, I broke one off and popped that. Those sprinklers, you know, like you see when you walk in like businesses, you see those silver things up in the ceiling, where the sprinklers are…
>
> Cindy: Yeah.
>
> Travis: It's a fire. I busted one of those and then I popped another one, but they'd already shut the water off, so.
>
> Cindy: Kyle, can I ask why you did that?
>
> Travis: Cause they were fuckin' with me.
>
> Cindy: Cause they were what?
>
> Travis: Guard got mouthy because I had my camera covered up in my cell and he went and uncovered it and got mouthy with me earlier in the morning. That's why I called ya and told ya I was fixin' to go ride out.
>
> Cindy: Yeah. *[unintelligible]*
>
> Travis: I rubbed my shit all over the cell and fuckin'…
>
> Cindy: Ew, Travis! That's gross.
>
> Travis: Yeah, well, treat me like an animal and I'm gonna act like an animal, fuck!

**D.     March 18, 2019: Threatening to kill a Freeborn County correctional officer.**

On March 18, 2019, Mr. Mayer told the officer on whom he threw urine in January that he would throw urine and feces at him again. He also threatened the officer, telling him that he was a "dead man" and that he would "kill" the officer. Mr. Mayer claimed he knew where the officer lived and he would "find him on the outside."

7

**E.    March 19, 2019:    Threatening to kill a Freeborn County correctional officer.**

On March 19, 2019, Mr. Mayer sent a message to the jail desk stating that before he left the jail, a staff member would die.

**F.    Multiple occasions, June 2019 to the present:    Threatening correctional officers at the Sherburne County Jail.**

Since being incarcerated at the Sherburne County Jail, Mr. Mayer's behavior has not improved. From June 2019 and continuing to the present, he has regularly and repeatedly threatened Jail staff (directly and in his conversations with others), damaged property, and assaulted staff. Below are just a few examples of this conduct, captured in Mr. Mayer's jail calls:

- **July 3, 2019**: "You guys are gonna make me catch another charge on one of you fuckers. Want me to throw piss on you? They're like, 'Well, that's not the way to handle that.' I, I don't give a fuck. I will fuck, don't fuck with my mail, don't fuck with my money, don't fuck with my phone call, don't fuck with any *[unintelligible]* my family. If you do that, I will fuck one of you guys up. Like I said, I don't care.

    "I'll catch, I'll stab one of these fuckers, I don't care. I don't care who's listening to this call. I'll stab one of these motherfuckers, I, I don't care."

- **July 6, 2019**: "But, I figure, you know, like I told 'em, I said, 'Listen, you guys are gonna make me get fuckin', you guys are gonna have a shitty day, you guys are gonna be pissed off and pissed on, and I'm gonna walk on the charges.' And guess what? I told 'em that last time and what happened? I walked on it."

- **July 10, 2019**: "The whole point is, if they fuck with me, I gotta ride out. *[stammering]*. You know me, I'll get butt naked again, I'll rub shit on myself and make 'em come in my cell. I don't give a fuck. I'll throw shit on 'em. I'll punch 'em. I'll stab 'em, I don't give a shit, you know me. Huh."

- **July 12, 2019**: "If they tell me they don't know why, I'm just gonna throw a cup of piss on 'em. I'll walk on the charge anyway. I'll walk on it again. I told 'em last time, 'I told ya last time I wasn't gonna get convicted of it, didn't I?'"

- **July 17, 2019**: "No, but, ummm, but yeah, irregardless, what I'm sayin' is, uhhh. So, uh, first time, it'll probably be piss or a punch to one of the COs, I'll

8

punch 'em or fuckin' throw piss on 'em, or shit.  Or maybe I'll jack off in a cup and throw cum on them."

"And then, and then the next time, and then the next time, it's gonna be fuckin', it's gonna be a fuckin' pencil in their … Ya know, I'll stab one of them."

"It'll escalate each time.  And I give them warnings.  And I promise you, I don't care who's listening to this phone call on the other end, I will walk on the charges, like I did last time.  I told ya that, didn't I?"

- **July 21, 2019**: "That Michael Sieg [Sherburne County Jail Investigator] guy, I mean, motherfucker, I'm gonna catch his ass and punch his fuckin' lights out. He's the investigator, he's probably the one listening to this call.  Michael Sieg, when I get out, I'm gonna fuck your wife and your daughter at the same time! I'm gonna tie your ass up and make you watch it.  I'm gonna make him watch it while I fuck his daughter up the ass."

- **July 22, 2019**: "Oh, and by the way, Michael Sieg, if you are listening to this and transferring it to the Feds, fuck you Michael Sieg, I'm still gonna fuck your wife and your daughter.  I may even let you watch.  And the Feds, suck my dick. Suck my motherfuckin' dick, Feds!  And U.S., Melinda Williams and Alex Chiquoine from U.S., United States Attorney's Office, yeah, you guys both know you're transgender as fuck.

### *The charged assault occurred on July 26, 2019*

- **August 5, 2019**: "Oh, I got in a bunch more trouble today."

"Aw, nah, I just told the sergeant, the female sergeant, she can suck my dick.  I was waiting for her to walk by so I could wave it at her."

"Nah, you know, like I said, they, they start on the bullshit, totally fuckin' *[unintelligible]*.  Now, now they got me in, and everything, how I'm instigating everybody else, getting' everybody else riled up, so.  Now they put me in a new spot, eleven block, which is this one cell by myself."

"I'm really close to, uhh, catchin' a, catchin' a body.  I'm serious."

"Well, I'll try and call him at 12:30 tomorrow when I get out.  Like I said, it's just coming to the point where I'm probably gonna end up tryin' to take one of these motherfuckers' lives."

"Next step is, the next step up is ridin' out and fightin' 'em, next step after that is fuckin' them up, and then the next step after that is takin' one of their lives. I, I, I, I warned 'em.  I tell 'em don't fuck with me, leave me alone.  I live in this motherfucking place and I'm gonna live comfortably, don't fuck with me.  I don't

9

give a fuck what your policy is.  What your policy says is, write a report, don't get mouthy with me and leave me the fuck alone.  I don't disrespect you, don't disrespect me just because I don't do something you tell me, I'm not meaning to do it to disrespect you, it's just the fact that I live here.  You guys go home.  Some of these staff brag about it, 'Oh, I'm gonna go home and sleep in bed, oh I'm gonna go home and drink a beer.  I'm gonna go home …'  Ok, keep saying that motherfucker and he probably won't be going home.  Motherfucker will take your life.  Then you won't go home.  Then your fuckin' wife …"

"Let them.  Listen, I don't care if I live or die.  I don't care.  That's one thing about it.  That, that, that, that's the advantage I got on them.  These motherfuckers want to go home, they want to go home to their families.  Me?  It's not that I don't want to go home, myself, *[unintelligible]*, but whether I live or die, it doesn't bother me.  Live or die, I don't care.  Shit, they afraid to die."

"I am, that's why I'm tellin' 'em, that's why I tell 'em.  Do I, or do I not, give people fair warning?  I tell 'em, 'Hey, don't fuck with me.  Knock that shit off, don't do that.'  I'm very, and I tell people what I'm gonna do before I do it, don't I?"

"They don't listen to it, and they think it's a joke, especially up here.  Motherfuckers up here are so used to people just running their mouths, saying they're gonna do something, then they don't do it.  [*unintelligible*] Everybody says they are gonna do something and then they don't do it."

"You know, hey, I'm not the one, I tell 'em all the time, look at my institutional behavior.  I'll get butt naked in my motherfuckin' cell, I'll shit on the floor, I'll rub shit all over me again and make them come in my cell."

- **October 10, 2019**:  "Give me my motherfucking mail.  Somebody's gettin' stabbed.  I'm all ready!  I want my motherfuckin' mail!  I'm not playing around.  I'm done …"

"They can listen to this phone call all they want, I don't care.  I don't give a fuck.  Somebody will not go home.  I promise that.  I promise on everything.  I, I swear to God, on Steven, on you, Harley, on everybody.  I swear.  Everybody, on everybody I love, you, Steven, Harley, fuckin' Linda, every, everything that means anything to me.  I promise, somebody's gonna end up not going home if they keep fuckin' with me."

"They got the right person, like I said, you know.  They ain't seen me mad, mad, or, they ain't seen me mad.  They seen me irritated.  That was me irritated over there, but that wasn't shit.  I didn't try and hurt anybody that fuckin' day."

- **October 18, 2019**:  "Like I said, I ain't switchin' at 1:30 today.  I, uh, I'm gonna cover up, I am gonna cover up, they are gonna have to come in here with gas,

10

there are gonna be 10, 12 staff that are gonna come in here. They're gonna come, they're gonna gas, they're gonna come in *[unintelligible]*, pod extract me, and I'm, uh, gonna catch more charges, just to let you know."

"Oh, I'm safe, like I said. Now, are they gonna be safe? No! One of them's getting fucked, hey, one of them's gettin' done up, one of them's getting done up. I got it all ready, somebody's getting done up. Those vests ain't gonna stop me. The shank vests they got, they ain't gonna stop this. This is going through. One of them's going to the hospital today. *[unintelligible]* So, …"[1]

- **March 13, 2020:** "I might be getting some more lockdown time here soon, so …"

  "I gotta do what I gotta do. I mean, they, they, I mean, I'm trying, but they, they want their rules, I'm gonna pull the inmate code out and do the inmate thing, you know? They got their policy and procedures …"

## IV. Inextricably Intertwined Evidence.

Mr. Mayer's other bad acts are all admissible without regard for the restrictions of Rule 404(b) because they are inextricably intertwined with the charged conduct. This is especially true for Mr. Mayer's conduct underlying his Freeborn assault charge and subsequent acquittal, and his numerous bad acts at Sherburne County Jail.

Evidence of a defendant's prior "bad acts" is admissible under limited circumstances. *See* Fed. R. Evid. 404(b). However, the admissibility of bad acts that are intrinsic to the charged offense is not restricted by Rule 404(b). *See* Fed. R. Evid. 404, advisory committee's notes, 1991 Amendments (distinguishing "intrinsic" acts); *United States v. Adediran*, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence).

---

[1] On October 18, 2019, Mr. Mayer again refused to peacefully leave his cell when ordered to by staff. He was ultimately forcibly extracted again, during which time he threw liquid on a guard.

11

All of Mr. Mayer's prior bad acts described above are admissible as intrinsic to the charged offense. Since January 2019, when he was still incarcerated at Freeborn County Jail, Mr. Mayer has engaged in a nearly endless campaign to threaten, harass, disrupt, and assault jail staff and damage correctional property. He brought his temper and attitude with him to Sherburne County Jail after being federally arrested and within a matter of months, committed the charged assault. His conduct is strikingly similar in each instance, involving a myriad of threats combined with property damage and assaults most often involving his bodily fluids and feces. Above all, this long running stream of abusive conduct shows that Mr. Mayer intended to and willfully did commit the charged assault on July 26, 2019. *See* Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 6.18.111, cmt. 4 (2017) (explaining that intent is an element, despite not being expressly listed). Therefore, evidence of Mr. Mayer's bad acts described above is inextricably intertwined with the charged conduct, not limited by Rule 404(b), and admissible.

Two categories of Mr. Mayer's bad acts are unquestionably intrinsic to the charged crime. First, Mr. Mayer's acquittal on the Freeborn County assault charge (despite his subsequent admission that he was guilty) emboldened Mr. Mayer to commit the charged assault at Sherburne County Jail. In numerous calls and letters leading up to and following the charged assault, Mr. Mayer reminded anyone who will listen that he "beat" the Freeborn charge and thus was not afraid to: (1) commit additional assaults or (2) go to trial on any resulting charge. It is no coincidence that Mr. Mayer committed the charged assault less than two months after his Freeborn acquittal. That acquittal provided Mr. Mayer with the impetus to commit the charged

assault. It goes directly to Mr. Mayer's intention to assault M.W. and T.B., an element of the offense.

Second, evidence of Mr. Mayer's plethora of threats to Sherburne County Jail staff and disruptive behavior within that facility are similarly inextricably intertwined in the charged offense conduct. From late June 2019 through at-least late October of 2019, and continuing even to the present, Mr. Mayer has acted out within the Jail dozens, if not hundreds, of times by threatening and assaulting staff, damaging property, and creating disruptions to the Jail's orderly operation. His conduct and statements often escalated to property damage or assault. It would be difficult for a jury to understand Mr. Mayer's assaultive conduct without the context of this threats and plotting that lead to and followed the charged incident. Therefore, this evidence is intrinsic to the charged conduct and admissible without regard for the limitations of Rule 404(b).

## V.     Admission of 404(b) Evidence.

Should the Court hold that any of Mr. Mayer's other bad acts described herein are not intrinsic to the charged offense, the Government respectfully requests that the Court find they are admissible pursuant to Federal Rule of Evidence 404(b).

Evidence of a prior bad act committed by a defendant may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Even <u>subsequent</u> bad acts that relate to the charged offense are admissible under the Rule: "While 'other bad acts' under Rule 404(b) are normally thought of as those committed prior to the crime

13

charged, occasionally evidence of subsequent acts is admitted for this purpose." *United States v. Edelman*, 458 F.3rd 791, 809–10 (8th Cir. 2006) (citation omitted).

The text of Rule 404(b) and Eighth Circuit case law make clear that it is a rule of inclusion, not exclusion. *United States v. Cowling,* 648 F.3d 690, 699 (8th Cir. 2011). That is, Rule 404(b) evidence offered for a proper purpose (*i.e.*, not solely to prove criminal disposition) is presumed admissible so long as it, like any other evidence, is not unduly prejudicial under Rule 403. *See United States v. Henson*, 939 F.2d 584, 585 (8th Cir. 1991). "The ultimate question [is] whether the evidence is admissible to prove any relevant issue other than the character of the defendant or his propensity toward criminal activity." *United States v. Thomas*, 593 F.3d 752, 758 (8th Cir. 2010) (citation and quotations omitted). To be admissible under Rule 404(b), evidence of other bad acts must be: (1) relevant to a material issue raised at trial; (2) similar in kind and close in time to the crime charged; (3) proven by a preponderance of the evidence; and (4) higher in probative value than prejudicial effect. *United States v. Anderson,* 879 F.2d 369, 378 (8th Cir. 1989).

Mr. Mayer's other bad acts described herein are admissible under Rule 404(b). Mr. Mayer's prior and subsequent threats against correctional officers, and damage to jail property, are relevant to the disputed material issue of whether he intended to commit the charged assault, to refute any suggestion of mistake or accident, to show that he prepared and planned the crime, and to establish that he had motive and opportunity to commit the offense.

**A.   The Defendant's Other Bad Acts Are Relevant to Material Issues at Trial.**

   **1. Intent and *modeus operandi***

Mr. Mayer pleaded not guilty to using feces to assault a federal officer. By his not-guilty plea, thereby denying that he intentionally committed the offense. *United States v. Wright*, 866 F.3d 899, 905 (8th Cir. 2017) (stating that, by pleading not guilty, defendant "put the government to its proof on all elements of the charged crimes," including knowledge and intent). Thus, the Government must offer evidence of his intent at trial.

Rule 404(b) evidence is admissible to show intent and state of mind in cases involving assault on law enforcement officers. *See, e.g., United States v. Street*, 66 F.3rd 969, 976 (8th Cir. 1995) (upholding admission of a defendant's subsequent threats to one park ranger admissible to show intent when he previously assaulted a different ranger); *United States v. Burk*, 912 F.2d 225, 229 (8th Cir. 1990) (upholding admission of a defendant's prior threat to assault police officer in prosecution for assaulting an IRS officer). Similarly, other bad act evidence is admissible to prove identity/*modus operandi* if it shares a "unique set of signature facts" with the charged offense, and the court makes a "threshold determination that a reasonable juror could find from comparing the acts that the same person committed both crimes." *United States v. Almendares*, 397 F.3d 653, 662 (8th Cir. 2005). Key to this determination is the distinctiveness of the facts and the time between the acts. *Id.*

Mr. Mayer's repeated threats to and assaults against correctional staff at Freeborn and Sherburne are circumstantial proof that he intended to, and knowingly did, assault M.W. and T.B. on July 26, 2019. Moreover, evidence of Mr. Mayer's

disgustingly unique method of assaulting correctional staff—flinging his feces and/or urine on guards in an effort to harm and humiliate them—goes directly to his identity as the assailant in the charged offense. Less than eight months before the charged assault, Mr. Mayer had thrown urine on a Freeborn guard and been acquitted after giving false testimony at trial. *See Almendares*, 397 F.3d at 662 (upholding admission of prior bad act evidence of previous robbery where facts and circumstances of prior robbery were similar to the ones charged, despite the fact that the robberies took place seven months apart).

### 2. Lack of accident or mistake

The Court should also find that Mr. Mayer's other bad acts are admissible to show lack of accident or mistake. In his previous Freeborn assault count, Mr. Mayer was charged with intentionally throwing urine on a correctional officer. At trial, Mr. Mayer testified that he had unintentionally/accidentally caused water to hit the officer. Mr. Mayer was acquitted and gloated afterwards that this defense had worked, admitting he was in fact guilty of the crime. The Government anticipates a similar "defense" from Mr. Mayer here. Regardless, evidence of Mr. Mayer's repeated threats to correctional staff, and his penchant for using his bodily fluids and feces to assault staff and damage property, is admissible to show the charged conduct was no accident or mistake.

### 3. Preparation, planning, and motive

Mr. Mayer carefully planned for and prepared his assault on July 26, 2019. He perfected his "technique" (i.e., hurling his feces and urine on staff) at Freeborn. His acquittal on the Freeborn assault charge taught him that this was a crime he could

get away with.  In dozens of calls and letters, Mr. Mayer graphically detailed in how he planned to assault Jail staff and that he would use his urine, feces, fists, or even a shank.  When his mother warned him against using a weapon, Mr. Mayer settled on repeating his "success" at Freeborn—he would hurl his urine or feces on the guards. Evidence of Mr. Mayer's other bad acts and threats go directly to showing this meticulous planning and preparation.

### B. The Defendant's Other Bad Acts Are Similar in Kind and Relatively Close in Time to the Charged Offense.

As to the second prong of the 404(b) inquiry, the other bad acts are nearly identical to the charged offense, involving volatile threats against correctional staff by Mr. Mayer and assaults and property damage usually involving his bodily fluids and/or feces.  The vast majority occurred within the seven months prior, or immediately following, the charged assault.  The Eighth Circuit has upheld the admission of much more distant bad act evidence.  *See, e.g., United States v. Gaddy*, 532 F.3d 783, 789 (8th Cir. 2008) (eleven years not overly remote in intent to distribute cocaine case); *United States v. Gant*, 721 F.3d 505, 510 (8th Cir. 2013) (twelve years not too long in arson case).

### C. The Defendant's Other Bad Acts Can Be Proved By A Preponderance of the Evidence.

To establish Mr. Mayer's other bad acts, the Government will call witnesses and more importantly, offer Mr. Mayer's own words and writings.  This evidence will easily satisfy the preponderance of the evidence standard under Rule 404(b).

**D.     Admission of the Defendant's Other Bad Acts Is More Probative Than Prejudicial.**

The fourth prong of the 404(b) analysis applies the standard that even relevant evidence may be excluded if its "probative value is <u>substantially</u> outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). "Damaging evidence is always prejudicial; the question is whether the evidence is <u>unfairly</u> prejudicial." *United States v. Tyerman*, 701 F.3d 552, 563 (8th Cir. 2012) (emphasis original); *see United States v. Petroske*, 928 F.3d 767, 772 (8th Cir. 2019) (Rule 403 "does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. Rather, the rule protects against evidence that is unfairly prejudicial." (citations and quotations omitted)).

The Government's evidence of Mr. Mayer's other bad acts is damning proof that he has a long and disgusting history of threatening and assaulting correctional staff in nearly identical ways to the charged assault. But that does not make it unfairly prejudicial. Moreover, given the striking similarities between Mr. Mayer's other bad acts and the assault with which he is charged, the probative value of this evidence substantially outweighs any prejudicial effect it might have. Finally, any argument that the prejudicial effect of the above-outlined conduct outweighs its probative value can be addressed by a cautionary instruction, given to the jury when the evidence is first admitted. *See United States v. Cowling,* 648 F.3d 690, 699 (8th Cir. 2011).

## VI.     Conclusion

For the forgoing reasons, the Court should admit the above-referenced evidence of Mr. Mayer's prior and subsequent bad acts. This evidence is intrinsic to and inextricably intertwined with the charged conduct and therefore admissible without regard for the limitations of Rule 404(b). However, even considering the limitations of that Rule, this evidence is clearly admissible to prove intent, motive, opportunity, identity, planning, preparation, and absence of mistake or accident.

Dated: September 16, 2020            Respectfully submitted,

                                                   ERICA H. MacDONALD
                                                   United States Attorney

                                                   *s/ David P. Steinkamp*

                                                   DAVID P. STEINKAMP
                                                   ALEXANDER D. CHIQUOINE
                                                   Assistant U.S. Attorneys